CASE 75—PETITION EQUITY—OCTOBER 3.

## Oneil, &c., vs. Miller, &c.

### APPEAL FROM MARION CIRCUIT COURT.

1. The changing of the papers making the assignment, and the evidences of the debt secured by it, as by renewals, does not change the time at which the six months' limitation begins to run under the act of March 10, 1856. It is the existence of the debt and the creation of the lien which determine.

2. The act of March 10, 1856 (1 *Stant. Rev. Stat.*, 553), contemplates pre-existing debts, and to make a sale inure to the benefit of the general creditors, there must be a previous indebtedness, and an intention to prefer it by the debtor in contemplation of insolvency. But when the creation of the debt and the securing it should be contemporaneous acts and part of the original contract, it was not intended that the mortgage or assignment should inure to the general creditors.

Oneil, &c., vs. Miller, &c.

J. P. KNOTT,                                        For Appellant,
                            CITED—
   *Act of March* 10, 1856, 1 *Rev. Stat.*, 553.
   *Act of March* 8, 1862, *Myers' Sup.*, 239.
   2 *Story's Equity*, 9th edition, sec. 1036b, 1040.


W. B. HARRISON,                            For Appellee, Miller,
                            CITED—
   2 *Kent's Com.*, 533.
   5 *Page's Repts.*, 49 ; *King vs. Donnelly.*
   3 *Humphrey*, 442 ; *Fish vs. Arrowsmith.*
   6 *Gratton*, 174.
   *Act of March* 2, 1860 ; *Myers' Sup.*, 533.


ROUNTREE & FOGLE, For Commercial Bank and Hamiltons,
                            CITED—
   2 *Kent's Commentaries*, 577, *vol.* 4, *p.* 138.
   2 *Marshall*, 334 ; *Hamilton vs. Wagner.*
   2 *Dana*, 479 ; *Thomas vs. Southard.*
   13 *B. Mon.*, 533 ; *Sanders vs. Davis.*


JOHN M. HARLAN,            For Appellees, Hamilton & Bro.,
                            CITED—
   6 *M. G. and Scott*, 136 ; *Burrill on Assignments*, 314.
   6 *B. Mon.; Rinehart vs. Bank of Kentucky.*
   11 *Wheaton*, 78 ; *Brooks vs. Marbury.*
   2 *Story's Equity Jurisprudence*, sec. 1036b.
   3 *Sim.*, 1 ; *Garrard vs. Lord Lauderdale.*
   3 *Merw.*, 767 ; *Wallyn vs. Coults.*
   3 *Sim. R.*, 14.
   4 *Russ. R.*, 6 ; *Page vs. Broom.*
   2 *Mylne & Keen*, 492 ; *Acton vs. Woodgate.*
   4 *Johns. Ch.*, 522, 529 ; *Nicoll vs. Mumford.*
   11 *Wendall*, 240–8; *Cunningham vs. Freeborn.*
   8 *Robinson's La.*, 262, 412.

16 *Alabama*, 560 ; 17 *Alabama*, 556.

3 *McLean*, 177 ; 11 *Wheaton*, 78.

7 *Peters*, 608, 613 ; 6 *B. Mon.*, 252.

4 *Mason*, 206 ; *Halsey vs. Whitney*.

*Burrill on Assignments*, 418 ; 4 *Pickering*, 522.

1 *Morris*, 296 ; 6 *Humphrey*, 313.

*Hill on Trustees, side page*, 215.

*Adams' Equity, side page*, 38.

4 *Metcalfe*, 213 ; *Millet vs. Pottinger*.

2 *Metcalfe*, 336 ; *Hampton, &c., vs. Morris, &c.*

1 *Metcalfe*, 458 ; *Terrill, &c., vs. Jennings, &c.*

3 *Metcalfe*, 392 ; *Commonwealth vs. Sims*.

JUDGE WILLIAMS DELIVERED THE OPINION OF THE COURT:

This litigation more substantially affects the rights of the Commercial Bank of Kentucky and Hamilton & Brother. This is a suit brought by appellant, as trustee, seeking to bring the transactions of J. M. Miller with the Commercial Bank and Hamilton & Brother within the operation of the act approved March 10th, 1856, to prevent fraudulent assignments, &c., and was filed September 29th, 1865.

November 30th, 1864, Miller, having then on deposit in England some $23,000 in gold, and desiring to borrow of the Commercial Bank some $40,000, checked upon this gold deposit in favor of the bank, and left it with them as collateral and only surety for the loan then made at four months' time, with authority in the bank to sell and dispose of this sterling exchange should he not meet his paper promptly at maturity. At its maturity, being required to make some arrangement, he then obtained from the bank an extension of four months for $30,000, and gave his bill for the remainder at thirty days, the bank still retaining the sterling exchange as security.

June 10th, 1865, Miller made an assignment to T. C. Woods for the benefit of his creditors, in which he recognized the lien of the Commercial Bank on his gold deposit in England. He had previously directed the bank to dispose of his sterling exchange thereon and to discharge said $30,000 due them. The bank did dispose of this exchange, and after deducting the $30,000, paid the remainder over to Woods as trustee of Miller.

March 25th, 1865, Miller had obtained a loan from the same bank on a four months' bill, drawn for his accommodation by Wm. P. McElroy, and indorsed by Wm. Spalding, for $19,528. McElroy, not being able to pay all his liabilities, also made an assignment to W. T. Knott, August 8th, 1865. He declining to accept the trust, a subsequent deed of assignment was made to Oneil, in which McElroy and Knott both join.

When the bank determined to sell Miller's sterling exchange, in order to have it more formal and in triplicate, the bank surrendered to him his old bills and took new ones. Appellant insists that the six months allowed by the statute to attack assignments should begin from this time ; but we cannot so adjudge. It is the existence of the debt, and not the date of its evidence, which is the substantial matter of inquiry, as decided by this court in *Terrell, &c., vs. Jennings* (1 *Met.*, 458).

This debt was created November 30th, 1864, and the assignment of this gold deposit then made to the bank as indemnity. The debt and the assignment were simultaneous acts, and the statute then began to run. The assignment had been made November 30th, and the bank continued to hold this lien without ever having surrendered it. The mere change of papers to make them more formal neither released its then existing lien nor created a new one. The bank is, therefore, protected in

a two-fold aspect—first, because the lien was a simultaneous act with the creation of the debt; and, secondly, because the six months in which the assignment and lien could be attacked had expired.

Miller had in the hands of Hamilton & Bro., commission merchants of Louisville, two hundred barrels of whisky, and owed them an account for storage, &c., for which they held a factor's lien, when, on May 4, 1865, he desired and obtained a loan from the People's Bank of $15,000, upon two bills of $7,500 each, at sixty and ninety days, drawn and indorsed by Hamilton & Bro., and accepted by him, and at the same time executed to them a writing, in which it is stipulated that "I have in possession of Hamilton & Bro. two hundred barrels of copper whisky, which they are authorized to sell at the best market rate on the maturity of said bills, or either of them, and apply the proceeds to the payment of said bills, or either of them, should I fail to pay the same; and said Hamiltons *are to hold said whisky as an indemnity for their indorsement of said bills.*"

This pledge and assignment and lien upon this whisky is also recognized in Miller's deed of assignment, in which authority is given to the trustee to sell at private sale instead of being at the expense or risk of a public sale upon market, as was usual.

In pursuance thereof, Woods, the trustee, did afterwards sell said whisky to Hamilton & Bro., who paid the two bills, and, after liquidating their own factor's account against Miller, paid the surplus to Woods, who received it.

The first section of the statute of 1856 declares " every sale, mortgage, or assignment " " made by debtors in contemplation of insolvency," " to prefer one or more *creditors* to the exclusion in whole or part of others, shall

operate as an assignment and transfer of all the property and effects of such debtor, and shall inure to the benefit of all his creditors," except that "nothing in this section shall vitiate or affect any mortgage made in good faith to secure any debt or liabilities created simultaneously with such mortgage, and lodged for record within thirty days after execution."

This statute evidently contemplates pre-existing debts, and to make the sale enure to the benefit of the general creditors, there must be a previous indebtedness and an intention to prefer it by the debtor in contemplation of insolvency.  But when the creation of the debt and the securing it should be contemporaneous acts and part of the original contract, it was not intended that the mortgage or assignment should inure to the general creditors.

The pledge or assignment in such cases is part of the contract, and a very important consideration for the creation of the debt; and when the debtor is in doubtful circumstances, more strongly evinces the importance of the security to the creditor, and the consideration given by him to it, and the more surely indicates that, without this, he would not permit it to be created.

Neither the spirit nor the letter of this statute, nor any public policy, forbids a debtor from creating a debt, though he be in failing circumstances, and it would be too hazardous to commerce and creditors to make the creditor's rights depend on the debtor's concealed knowledge of his own affairs or his concealed motive.

If the creditor should so act as to indicate that he was aiding the debtor to evade or violate the statute, doubtless then it should apply to debts and securities therefor, though simultaneous; but unless this shall appear, it should be presumed the creditor was acting in good faith to protect his own interest, and would not have permitted

the creation of the debt but for its being secured. As there is nothing to evidence that Hamilton & Brother were aiding Miller to violate the statute of 1856, or the rights of any of his creditors, we must presume they were acting in good faith to protect their own interest; and but for this indemnity, would not have indorsed for Miller, and therefore no cause of action has been manifested against them. There are several other interesting questions presented in this record, such as whether, if Miller intended to evade the statute, this might not operate a transfer of his other property, though neither the bank nor Hamilton & Brother could be disturbed. Also, whether McElroy, having made a deed of assignment to Knott, who refused to execute the trust, could even, by Knott's joining him in a subsequent deed, appoint another trustee, or whether this appointment belonged to the chancellor. And if it be conceded that McElroy could revoke the first deed before accepted by the trustee or creditors, and therefore could appoint another trustee by subsequent deed, yet whether he and his trustee would not be bound by the compounding which had been made with Miller, and therefore bound for any action against the latter, his assignees, or his funds.

We have not, however, deemed it necessary to investigate these questions.

The judgment is affirmed.